Breitel, J. (dissenting in part).
A number of school districts contend on this appeal that the New York State Teachers’ Retirement System has illegally assessed them for contributions to the system in violation of explicit, mandatory provisions of the governing statutes and in the exercise of a purported discretion which the Retirement Board does not have.- The petition and amended petition seek redetermination of the rates of contribution imposed on the school districts as employers under the system and the refund of allegedly excessive payments.
Special Term, on the pleadings and supporting papers, held that the four-month Statute of Limitations (CPLR 217) applicable to the review of discretionary determinations in article 78 proceedings barred the several claims. In the alternative, Special Term held that if the claims were in the nature of mandamus they were barred by laches. Reaching the merits, it held that the board had the discretion to impose the questioned rates of contribution and that the exercise of discretion was not unreasonable (46 Misc 2d 225). The Appellate Division, in affirming, did not determine the merits; although noting that there was apparent substance to some of the contentions of the school districts, it held that the several claims were barred by the Statute of Limitations or laches (27 A D 2d 265).
A simplifying factor in the analysis of this ease is that the limitations or laches issues are rolled up into the substantive *234 issue and are largely controlled by its resolution. The ultimate substantive issue is whether the board, under the governing statutes, has discretion in determining the employers’ rates of contribution or whether the statutes are explicit and mandatory, leaving no discretion to the board in using specified interest and actuarial factors in determining the liabilities of the system and, therefore, the requisite rates of contribution.
If the board has the discretion claimed for it by respondents, then the four-month Statute of Limitations applies from the time the board made its several determinations, and the claims are barred. On the other hand, if the statute explicitly mandates the precise factors to be used in computing the liabilities and rates of contributions, then the duty imposed by the statute continues and the limitation period does not begin until demand has been made upon the board and it has refused to perform its statutory duties. Of course, the proceeding may still be barred by the equitable doctrine of laches. Hence, analysis inevitably searches out the initial issue of whether the board had the purported discretion it exercised (and if the exercise was also a reasonable one). Thus, the procedural and substantive issues may be largely determined by the same analysis.
The board is charged with the administration of the retirement system, which furnishes, among other things, retirement allowances and death benefits for public school teachers upon their retirement from the school system or death (Education Law, §§ 502, 504, 510). The retirement allowances consist of employee-contributed annuities and employer-contributed pensions (§ 510). This case involves only the rates of contribution by employers to fund the pensions and part of the death benefits. These payments are largely financed from a pension accumulation fund, which is funded through yearly assessments made upon school districts at a rate based upon the total compensation paid to teacher members of the retirement system (§ 517, subd. 2). The assessments consist of three contributions: the “normal contribution ”, the “ deficiency contribution ” and the “ special deficiency contribution
The ‘ ‘ normal contribution ’ ’ rate is applied to the total compensation earned by those teachers employed after August 1, 1921 who became members of the retirement system after May 1, 1924 (“ new entrant ”), and is designed to accumulate sufficient *235 funds to cover pensions and death benefits for new entrants upon their retirement or death (§ 517, subd. 2, par. b).[1] The “ deficiency contribution ” rate is applied to the total compensation of all member teachers and is designed to accumulate sufficient funds to cover pensions and death benefits not covered by the normal contribution (§ 517, subd. 2, par. e).[2] Historically, the deficiency represented the pension liability for teachers who had been employed before the pension accumulation fund had been established (“ present teachers ”) and thus before contributions to fund their pensions and death benefits, to the extent they reflect prior service, could have been assessed. The school districts contend that the scope of the deficiency contribution is confined to its historical purpose, while the board argues that it is not so limited.
Section 517 provides that the deficiency contribution ‘ ‘ shall be discontinued ” when the moneys in the pension accumulation fund, together with the moneys which would be accumulated in the future through the normal contribution, would be sufficient to cover future aggregate pension liabilities as actuarially computed and approved by the board (§ 517, subd. 2, par. e). After the deficiency contribution has been discontinued, the normal contribution rate is computed on the basis of the compensation of all member teachers under a slightly different formula (§ 517, subd. 2, par. b).[3]
The “ special deficiency contribution,” by express statutory authorization, has been assessed since the school year 1958-1959 *236 in order to fund a then newly created substantial increase in pension benefits. The rate of this assessment is computed as follows: ‘ ‘ the annual payment which if made in each fiscal year commencing with the year beginning the first day of July, nineteen hundred fifty-eight, for a period of thirty years will provide for such special deficiency and the per centum of the total compensation of all contributors during the preceding school year which is equivalent to such annual payment shall be known as the special deficiency contribution rate.” (§ 517, subd. 2, par. c; L. 1956, ch. 730.) An unexpected annuity liability, resulting from the decision of this court in Birnbaum v. New York State Teachers Retirement System (5 N Y 2d 1, mandating the use of mortality tables extant when members entered the system), is also funded by express statutory direction through this special deficiency contribution (§ 517, subd. 2, pars, c, g; L. 1959, ch. 141).[4]
Computation of the normal, deficiency, and special deficiency contribution rates is based upon a valuation of assets and liabilities, that is, by taking and balancing the total amount of present and future liabilities on the pension side of the system, and the prospective accumulation to meet those liabilities from present assets and returns from future contributions by employers. These valuations require the use of a number of actuarial assumptions, such as the length of eligible service of member teachers, the length of time over which pension payments will be made, and the interest which will be earned by the moneys in the pension accumulation fund (§ 508, subds. 2, 5). Valuations necessary for determining the normal contribution rate are to be made, the statute provides, “ On the basis of regular interest and of such mortality and other tables as shall be adopted by the retirement board ” (§ 517, subd. 2, par. b). “ Regular interest ” is statutorily defined as 4% as to teachers *237 who became members of the system on or before June 30, 1948, and 3% as to teachers who became members on or after July 1, 1948 (§ 501, subd. 9). Similar provisions are contained in the statute with respect to other fund valuations (e.g., § 501, subds. 10,15,16).
It is now appropriate to turn to a resolution of the issues as they are presented in the five causes of action. The first two relate to the allegedly illegal imposition by the board of deficiency contributions after the initial or historic deficiency resulting from the provision of benefits for teachers with prior service (present teachers) had been fully discharged under the statutory scheme for funding that deficiency. The board concededly used the deficiency contribution for 1963-1964 to fund a deficiency created by the failure of the accumulated funds to earn regular interest. It is concluded that the board’s imposition of a deficiency contribution beyond the period necessary to provide funds for the pension payments to present teachers was unlawful for two reasons. First, the deficiency contribution could not be continued for purposes other than the historic purpose. Second, even if the deficiency contribution could be used for other purposes, it could not be used to fund an interest deficit resulting from the board’s use of a “ more realistic ” interest assumption rather than that authorized by statute in making the directed necessary valuations.
In their third and fourth causes of action, the school districts contend that the special deficiency contribution rate has been improperly fixed, resulting in liquidation of the special deficiency within a shorter period than the 30 years mentioned in the statute. It is concluded that in setting a constant rate for assessment of the special deficiency contribution on an initial assumption of a 30-year period for liquidation, the board properly followed the statutory formula, which does not also require that the liquidation of the deficiency, as it actually works out, be extended over any specific period of time.
In the fifth and final cause of action, the school districts challenge the normal contribution rate fixed for 1964-1965. In fixing this rate the board considered three disputed factors: (1) “ possible use of a 3% percent interest rate ”, rather than uniform application of the “ regular interest ” rate; (2) an adjustment in the mortality tables to allow for changes in mortality rates; *238 and (3) anticipated liabilities for “ death-gamble ” benefits not yet enacted. It is concluded that the consideration of each of these factors was unauthorized under the statutory formula for determining the normal contribution rate.
The first and second causes of action involve the assessment of the deficiency contribution for 1962-1963 and 1963-1964. The 1962-1963 deficiency contribution resulted in the collection of $31,636,494, more than enough to liquidate the historic deficiency balance of $20,443,787. The school districts contend that the 1962- 1963 assessment was illegal and seek recovery of the over-collection (first cause of action). Moreover, the board assessed a deficiency contribution for the year 1963-1964, after the historic deficiency had concededly been liquidated. Petitioners contend that no deficiency contribution could be assessed for 1963- 1964 and seek recovery of the entire assessment (second cause of action).
The board contends that it was proper to continue the deficiency contribution in order to obtain funds to cover an “ interest deficit ’ resulting from the failure of the fund to earn ‘ ‘ regular interest”, and other liabilities. Thus, in 1963, when the historic deficiency was concededly liquidated, the board provided for a new deficiency, taking into account the interest deficit, the liabilities imposed by the Birnbaum case, and the expectation that certain temporary but renewable death-gamble statutes would be continued. The rate for the newly calculate^ deficiencies was to be applied for the fiscal year 1963-1964.[5] The board maintains that the statute does not require that the deficiency contribution be terminated once the initial or historic deficiency has been liquidated. They further assert that their purposes in continuing the deficiency contribution were fiscally sound and within their discretionary powers under the statute.
Under the statute the initial or historic deficiency is that amount of prospective pension liability “ on account of all contributors and beneficiaries ’ ’ not dischargeable by the actuarial value of future normal contributions (§ 517, subd. 2, par. c). The normal contribution rate, assessed on the basis of prospec *239 tive pension liability to new entrants, is designed to accumulate sufficient funds to cover pension payments to new entrants. Thus the prospective liability or deficiency which would not be discharged by the normal contribution rate can only be that liability to present teachers, for whom there had been no funding during their earlier service. (As already noted, there were separate statutory authorizations made from time to time to fund newly created or unanticipated liabilities, namely, increased benefits and the Birnbaum case liabilities.)
It is conceded by the board that this historic deficiency had been liquidated during the year 1962-1963. Under the statute, it was then necessary to discontinue the deficiency contribution. Thus, the statute states that “ [ti]he deficiency contribution shall be discontinued” as soon as the present value of prospective pension liability is covered by the value of present assets and the actuarial value of future normal contributions (§ 517, subd. 2, par. e). Since that condition was fulfilled by 1963-1964, the board no. longer had power to assess further deficiency contributions.
Even assuming that the deficiency contribution could be used for purposes of funding liabilities other than those owed to present teachers, the three ostensible purposes of the board were invalid.
First, the board may not, as it attempted to do, fund a liability resulting from the use of interest assumptions other than the regular interest prescribed by the statute. In determining the liability to be funded by the normal contribution rate (“ pension reserve ” for new entrants) the statute requires the use of an assumption of regular interest. It would not make much sense to require a regular interest assumption in determining the contributions necessary to discharge one portion of total pension liability and then to permit the use of different interest assumptions in determining how to liquidate the deficiency or remainder of the total liability. After all, the deficiency is simply the difference between total liability and the pension liability to new entrants. To use different interest assumptions in computing different parts of the formula would be inconsistent.
It is concluded, therefore, that the statute requires the use of regular interest in computing the deficiency contribution as well as the normal contribution. Indeed, the above analysis is *240 actually supported by the actions of the board in previous years. Thus, it was not until 1963-1964 that the relevant valuations were made by the board on the basis of anything other than regular interest, even though in 1958 it was clear, at least to the board, that the regular interest figure was “ unrealistic ”, in the sense that it did not conform to the actual earnings for a considerable period.
It may be true, as the board contends, that the uniform use of regular interest will result in an interest deficit, since the assets for a substantial period have earned less. Under the statutory formulation, this deficit enters into the computations when the assets in the fund fail by accumulation to reach expected levels. Although the purpose of the board in recomputing the pension liability seems designed to prevent accelerating rates of normal contribution because of the failure of the assets on hand to reach expected levels, the statute does not provide for this approach. All valuations must be made using regular interest assumptions, and, if the result is a stepladder effect, the cure is in legislation rather than unauthorized board action. Nowhere in the statute is there language suggesting a power to make discretionary adjustments in the stated factors; rather the modes of computation are rigorously specified.
The nub of the issue, of course, with respect to the mandate to compute reserves on an assumed 4% interest rate, is that the rate is used to determine the rate of accumulation of vast funds. Certainly, the goal of accumulation of funds in any actuarial scheme is satisfaction of the total of anticipated liabilities. These are the factors in any actuarial computation, and the principles involved are most elementary. It is, of course, impossible to obtain a level rate or an advance rate based on actual earnings because none knows the future. In the insurance and annuity business earning rates are assumed. Such assumed rates will never be identical with any current earning rate. They will be either higher or lower. The initial assumed rate is vital to the computation, however, and is based not on short-term but long-term experience. In the private life insurance and annuity business the assumed rate of interest for computing reserves never changes once fixed in the contract or policy. Industry-wide changes have been made only after the passage of many years, sometimes decades. But the interesting and highly *241 relevant factor is that changes in the assumed interest rate in the computation of reserves in the insurance-annuity industry is closely controlled by statutes and the regulating State departments. No discretion as that claimed here is lodged in the accumulators of the vast funds involved. In this case, the board claims a discretion, limited only by unreasonableness, to adjust assumed interest rates, and does so in the face of the statutory language that regular interest, defined as 4%, shall be the rate at which reserves are to be computed. Indeed, the statutory direction becomes wholly insignificant if the board is free to change the rate, either by direct alteration or by the two-step adjustment to the same end. The irony is that after the board claimed to do this, later financial developments, persisting now for some years, prove that the 4% rate is not so unrealistic over the long-term, as the shorter term experience seemed to prove.
The board’s second purpose, the attempt to use the deficiency contribution to fund the Birnbaum liabilities, was also improper, since funding for these liabilities was specially provided by the Legislature through the special deficiency contribution. Indeed, it is difficult to understand why the board thought it proper to introduce the Birnbaum liabilities in justifying the continued deficiency rate. The majority opinion ignores the salient fact that the Legislature made provision for funding the Birnbaum case liabilities, and did so, not by assessments through the deficiency contribution, but, and this is extremely important, through the special deficiency contribution. This is a cogent indication that neither the pre-existing legislation nor the deficiency contribution was available for that purpose.
The third purpose, the provision made by the board for death-gamble benefits not yet legislatively enacted, was also improper since it assumed the repeated extension of the temporary statute and thus the existence of liabilities which had not aetuarially or legally arisen. In effect, the board has attempted to provide funding for death-gamble benefits on a long-term accrued basis, whereas the “ death-gamble ” statute provides only for a year-to-year pension liability. While it is undoubtedly true that the benefits are likely to be continued, the statute does not authorize the estimate of liabilities on conjectures, however strong, but only on the basis of actuarial experience and liabilities legally fixed.
*242 The board justifies its use of the deficiency contribution for the above three purposes by the language of section 517 (subd. 2, par. e), which provides that the deficiency contribution shall be discontinued as soon as the accumulated reserves plus the present value of future contributions equal the present value of total liability 11 as actuarially computed and approved ’ ’ by the board. Whatever the meaning of the quoted language, it cannot mean that the board is free to ignore specific directives in other sections concerning methods of valuation and funding.
Thus, the second cause of action which requests a refund of the deficiency contribution assessed in 1963-1964, after the historical deficiency had been fully liquidated, should be sustained.
However, the first cause of action, which seeks recovery of a portion of the deficiency contribution assessed during 1962-1963, has no merit. The school districts base their claim on the fact that the contribution for that year was more than sufficient to liquidate the deficiency. But, the statute does not prevent collection of a deficiency contribution during the year of liquidation in excess of that required to liquidate the deficiency. First, obviously it would be impossible to determine a deficiency contribution rate which would result in liquidation to the exact penny. Second, the statute specifically requires that “ the amount of each annual deficiency contribution shall be at least three per centum greater than the preceding annual payment ” (§ 517, subd. 2, par. d). Where, as here, the total deficiency to be liquidated is less than the amount of deficiency contribution of the year before, the contribution collected during the year of liquidation must inevitably result in over-collection. In setting a deficiency contribution rate which would result in over-collection, the board acted in accordance with.the statutory mandates. Thus, there is no basis for a refund of any part of the deficiency contribution assessed for the fiscal year 1962-1963. Hence, the first cause of action should have been dismissed, as it was.
Turning to the third and fourth causes of action, the school districts assert that, because the board established, pursuant to the statute, a special deficiency contribution rate in 1958-1959 which has since been constantly applied, the special deficiency will be liquidated over a 17-year period. This results, as a matter of experience, from the increased teacher payrolls to which the rate is applied. Under their interpretation of the *243 statute, the special deficiency must be liquidated over a 30-year period through a uniform assessment each year. The board interprets the statute as requiring that an initial assessment rate be computed in the year of computation on the basis of liquidation in 30 years, but that that rate must then be applied uniformly in subsequent years until the special deficiency has been liquidated, regardless of how subsequent experience might accelerate (or decelerate) the intended ultimate accumulation of reserves.
The interpretation of the statute by the school districts is not supported by the language. The provisions governing the special deficiency contribution require that the actuarial valuation of pension liability not dischargeable by the funds in hand and the normal and deficiency contributions (“ special deficiency ”) be made as of June 30, 1957. The actuary must at that time determine that annual payment which, if made uniformly from July 1, 1958 for a period of 30 years, would provide for the special deficiency already determined. The special deficiency contribution rate is then fixed at ‘ ‘ the per centum of the total compensation of all contributors during the preceding school year [i.e., 1957-1958] which is equivalent to such annual payment ” (§ 517, subd. 2, par. c).
The 30-year figure is thus used only as a factor for computing a uniform rate to be applied each year.[6] Thirty years is not the period of time over which the special deficiency must be liquidated, but only an initial assumption, legislatively directed to alleviate the burden on the school districts as it would be at the time of computation.
Thus the adoption by the board of a special deficiency contribution rate, to be applied uniformly for as many years as necessary to liquidate the special deficiency, was in accord with the statutory mandates, and the third and fourth causes of action should have been dismissed, as they were.
The fifth and final cause of action challenges the method by which the normal contribution rate was fixed for the school year *244 1964-1965. The school districts maintain that the allowance for “ possible change in the mortality tables ” was illegal since the statute requires that mortality tables “ adopted ” by the board be used; that the allowance for 1 ‘ possible use of a 3% percent interest rate” was illegal since the statute requires that computations be based upon 1 ‘ regular interest ’ ’; and that the allowance for the payment of anticipated future “ death-gamble benefits ” was illegal, since these benefits had been granted only to those member teachers who died before July 1, 1965, and had not yet been extended by the Legislature. The board replies that it is aetuarially sound to allow for mortality table changes, and again points to the fact that the fund had not been earning expected interest. It also points out that death-gamble benefits had been extended each year for an additional one-year period, and there was every reason to believe that the Legislature would continue to do so. Since these benefits would almost certainly become a future pension liability, it was necessary to allow for them. The board maintains, therefore, that the consideration of all these factors was a proper exercise of discretion in accord with its responsibility for maintaining a fiscally sound pension system.
The inclusion by the board of each of these factors was in contradiction, however, of the statutory mandates.
The statute provides, as to mortality tables, that valuations for purposes of setting the normal contribution rate be based on mortality tables “ adopted ” by the board. What the board did, however, was to adopt mortality tables based on proper actuarial experience and then to make gross mechanical adjustments based on conjecture as to the length of time in which such tables would become obsolete. If the adjustment for the “one-year setback” was intended to express an actuarial experience as to the “ mortality ” of the mortality tables, based on proper data, it might have been reasonable. In that case, however, such an actuarial experience should have been reflected by the adoption of new mortality tables. Moreover, it has not been shown that the one-year setback is any more valid than a two-year or ten-year setback or, for that matter, a one-year advance, or that the obsolescence of a mortality table works evenly over the whole age scale of the table. Indeed, the board *245 concedes that this adjustment was a gross “ across-the-board assumption.”
In addition, the board admits that the one-year setback was not based solely on any actuarial experience or even assumption concerning the rate of obsolescence of mortality tables, but was also designed to compensate for interest deficit and any other losses or deficits that might arise. Thus, what is involved here is not simply a procedural defect which could be remedied by formal adoption of a new mortality table. "What the board has actually done is to approve an actuariallv sound mortality table and then use it as a starting point for conjecture. This sort of speculative computation is not permitted by the statute, is indeed forbidden, and, if allowed, would permit rather uncontrolled manipulation of the funds, arbitrary interference with the tax impact on districts, and the improper over-accumulation of funds in the control of the board.
The allowance for “ possible use of a 3% percent interest rate ” is also invalid. The statute explicitly requires that valuations used for determining the normal contribution rate must be based on “regular interest”. The use of any other interest figure is, therefore, not authorized.
Finally, the board’s consideration of possible pension liabilities based on death-gamble benefits not yet created was improper. Again th.0 statute’s mandate is clear. The normal contribution rate for 196A-1965 was designed to provide funds sufficient to cover a reserve for the current pension liability, which, as to teachers who did not die prior to July 1, 1965, did not include a death-gamble benefit. The legislative scheme is a plan for funding future liabilities based on actuarial computations, that is, experience and legally fixed liabilities, and not on conjecture, however reasonable, as to future legislative action. If the legislative intention is that death-gamble benefits will be extended each year, or that the liability should be funded on that tentative assumption, then it is up to the Legislature, rather than the board, to establish provision for such funding, as was done with increased pension benefits in 1956 and the Birnbaum case liabilities.
Thus the method by which the board computed the normal contribution rate for 1964—1965 was invalid, and petitioners’ fifth cause of action should be sustained.
*246 The analysis thus far demonstrates that the statutory scheme binds the board by specific and explicit rules governing the actuarial administration of the retirement system. More extended consideration confirms this view of the statutory language by establishing the legislative purpose. The reason for the Legislature’s concern should be apparent.
If the board were to possess the discretion claimed for it, the factors so precisely fixed by the Legislature would become meaningless. An adjustment in any one of the factors (such as a 3%% interest rate rather than 4%), superficially involving small numbers, may have considerable financial impact on school districts by reason of the huge sums to which the factor is applied.
The financial implications of the exercise of such discretionary powers are evident from the sums involved in each cause of action in this case. The deficiency balance carried on the books during 1962-1963 was $20,443,787. The deficiency contribution rate of 4.29%, assessed against a total payroll during that year of approximately $778,000,000, resulted in the collection of approximately $32,000,000. The result was an over-collection of some $12,000,000, which the school districts seek to recover in the first cause of action. No deficiency was shown on the balance sheet as of June 30, 1963, the previous balance having been completely liquidated by that year’s collections. The deficiency contribution rate of 4.29% applied to the 1963-1964 payroll of approximately $817,000,000 resulted in the collection of some $35,100,000, which total sum is the subject of the second cause of action. The special deficiency contribution rate was set at 1.35%, designed to fund a special deficiency of approximately $106,366,000 as actuarially computed on June 30, 1959. Although the record reveals no figures showing the actual amounts of overpayment which the school districts contend they have made pursuant to the erroneously fixed special deficiency contribution, they estimate the refund necessary as approximately $30,000,000. The normal contribution rate recommended by the actuary for 1964-1965 was 11.43%, and included a 1.5% component for the factors improperly considered. The actual rate adopted was 10.72%, which might or might not have included the full 1.5% for the illegal factors. Although the total payroll for 196A-1965 do.es not appear in the record, the *247 school districts estimate that the refund to which they would be entitled is in excess of $12,000,000.
Moreover, the control of such huge funds by the board has significant economic and social consequences. It would be rash to leave the board with power to manipulate the size of such funds by discretionary adjustments of factors with such tremendous leverage. Illustrative of the great sums involved is the increase in funds controlled by the board. From June 30, 1960 to June 30, 1964, the increase was from $704,169,121.08 to $1,292,822,969.37. Annual contributions collected from school districts in the same period increased in similar proportion from $70,887,975.79 to $124,231,656.80. According to the board, the present value of the system’s liabilities when this proceeding was brought was $2,707,225,067, and as of Juné 30, 1967 was $5,033,710,811.
The board justifies its view that the statute impliedly allows for the exercise of discretion, although there is no express language to that effect, on the ground that there is a need to make certain adjustments in order to maintain a fiscally sound system. However that may be, when serious problems of adequate funding have arisen, special legislation, rather than board discretion, has been the Legislature’s solution, as with the Í956 increased benefits and the Birnbaum case liabilities, previously noted.
Because of the serious consequences that assessment rates have upon the burden of local school districts, to permit these rates to be freely varied through the interposition of ‘1 discretionary ” glosses on the explicitly defined factors would be ¡to place an unwarranted power over the school districts in the hands of the board. On the other side, the too easy accumulation of unnecessarily huge funds, with concomitant opportunities for investment, control, and influence, represent dangers which for over half a century have produced rigorous supervision and controls in the fields of insurance, annuity, and investment funds (cf. A Special Report to Governor Nelson A. Rockefeller on the New York State Teachers Retirement System, New York Insurance Department, Dec. 20,1965, pp. 11-12, iii). In short, a pragmatic view of the statutory scheme forbids the conclusion, based only on implication, that the board has the type of discretion in fixing contribution rates which it sought to exercise.
*248 Eliminating the disputed discretionary power, the standards for applying limitation periods arise rather simply. Since the manner in which the board may fix proper contribution rates was mandated, the four-month Statute of Limitations runs from the time of the refusal of the board, upon demand, to perform its duty (CPLE 217; see Austin v. Board of Higher Educ., 5 N Y 2d 430, 442; Matter of Cash v. Bates, 301 N. Y. 258, 261; Matter of Williams v. Morton, 297 N. Y. 328, 334). In the case of the first two causes of action, those relating to the assessment of the deficiency contribution, demand was made by petitioners at a meeting of the board on April 24, 1964. Thus the petition, served July 20,1964, was served within the four-month statutory period. As to the third and fourth causes of action, seeking recomputation of the special deficiency contribution, the article 78 petition itself was the demand, and the four-month statutory limitation would be no bar. The demand for proper assessment of the normal contribution rate was made when an amendment to the original petition, adding the fifth cause of action, was served by stipulation on January 29, 1965. Here, too, since the demand was made concurrently with the institution of the cause of action, the four-month statutory limitation is not a bar.
The only remaining question, then, is whether there was an unreasonable delay in making the demands, or any of them, thus invoking the doctrine of laches. The intention of CPLE 217 to impose a short Statute of Limitations for the review of administrative determinations cannot be frustrated by the simple device of delaying the making of the demand so as to toll the statute (Austin v. Board of Higher Educ., 5 N Y 2d 430, 442, supra). Thus, under case law, it was necessary that the demand be made within a reasonable period of time after actual or constructive knowledge by the school districts that illegal rates of contributions would be assessed (Matter of Amsterdam City Hosp. v. Hoffman, 278 App. Div. 292, 297).
The .courts below acted on the assumption that the delay should be measured from the date the board’s determination fixing the assessment rates was made. However, delay in making the demand should be measured from the date that the fixing of improper contribution rates was or should have been discovered (Matter of Amsterdam City Hosp. v. Hoffman, supra; Matter of McDonald, 34 App. Div. 512; see, also, Matter of *249 Kleinman, 20 A D 2d 594; Matter of Devens v. Gokey, 12 A D 2d 135, 137, affd. 10 N Y 2d 898). To require that the demand be made before the school districts were or could have been aware that the board had acted illegally would be unreasonable.
Since the rulings of the courts below concerning laches were based on erroneous standards, they are not conclusive. In any event, a review of the record established that, as a matter of law, laches does not bar the first, second and fifth causes of action. As to the third and fourth causes of action, laches could well be found, but this issue need not be resolved in view of the determination that these causes of action should fail on the merits.
The school districts did not acquire knowledge that the board had assessed deficiency contribution rates, which resulted in collection in excess of the deficiency balance in 1962-1963 and thus improper collection of any deficiency contribution for 1963-1964 (first two causes of action), until a meeting of the board held March 19, 1964. In support of their position that the school districts should have known earlier of the alleged impropriety of the rates as assessed, the board has pointed to the ability of the school districts to make the simple arithmetical computation which would have revealed the impending liquidation of the deficiency. However, there is no indication that the valuations, that is, the data or massive figures upon which the rates were to be computed and applied, were known to the school districts before the March 19, 1964 meeting. In fact, the official valuations of the system for 1962-1963 by the actuary, revealing the relevant figures, were not approved by the board until April, 1964. Thus the demand, made one month after the school districts could possibly be aware of the illegality of the challenged assessments, was certainly not unreasonably delayed.
However, the third cause of action might well be barred by laches, if it indeed had merit. It seeks a refund of the special deficiency contributions actually collected since 1958-1959, on the ground that the rate improperly provided for liquidation of the special deficiency balance over a 17-year rather than a 30-year period. The challenged special deficiency rate was fixed on April 27, 1958, and was constantly applied in each successive year, a fact of which the school districts must have been aware. Since the gravamen of the third cause of action was the assess *250 ment in the past at a constant rate (rather than an annual contribution of a constant amount), this cause of action would seem to be barred by laches.
The same analysis, however, does not bar the fourth cause of action, which seeks recomputation of the special deficiency contribution rate for future years. This cause of action demands that the board determine the special deficiency contribution properly in the future; hence, it challenges determinations which have not yet been made. Like the third cause of action, however, this cause of action does not survive on the merits.
Determination of the timeliness of the demand contained in the fifth cause of action (for recomputation of the normal contribution rate for the 1964-1965 year) is complicated by the difficulty in fixing a precise time for the board’s failure to perform its duty. In the earlier laches discussion, it was assumed that the relevant time was when the school districts learned of the board resolutions fixing the rates of assessment (March 19,1964). However, the passing of the resolutions alone would not constitute a breach of a duty until the contribution was actually assessed according to this improper rate. Under the statute, the process of actual collection of employer contributions does not begin until the board “ certifies] to the commissioner of education a statement of the total amount necessary to be paid by all employers for the ensuing fiscal year * # #
as provided under [§ 517, subd. 2] ” (§ 521, subd. 2, par. a). The ultimate duty which the board must perform, then, is to certify the contributions required, applying a legal rate of assessment to the total compensation of member teachers. Such certification, however, could not be made until the total compensation had been established, which would only be after the close of the relevant school year. Thus, as to 1964-1965, this certification could be made, at the earliest, on June 30, 1965.
It would thus appear that for a considerable period of time following the board resolution of March, 1964, the normal contribution rate would not become effective. The amendment to the petition, setting forth the fifth cause of action, was served on January 29,1965, at least five months before the board would be in a position to certify the contributions to be collected. Thus at the time the amendment was served, the board’s resolution *251 had not yet become a final decision improperly assessing the 1964-1965 normal contribution.
Because the record does not make clear when the board took the final action which would constitute a failure to perform its duty, the doctrine of laches cannot be applied. Hence, as a matter of law, there was no unreasonable delay shown in making the demand.
But, even endeavoring to apply the doctrine, the delay was, at most, 10 months, assuming the measurement should commence from the board meeting of March, 1964 at which the school districts presumably obtained knowledge of the resolution. In view of the complexity of the issues involved, this period of time was not unreasonable.
Moreover, the board was always aware of the dissident contentions. Six months before service of the amended petition, that is, in July, 1964, the board was aware that the school districts contended that the consideration of an interest rate other than regular interest, and the consideration of death-gamble benefits not yet legislatively enacted, were in excess of its statutory authority. Although these contentions, as asserted in the first and second causes of action, involved the deficiency contribution rate, their application to the normal contribution rate is obvious. Thus, the board should have been aware of the demand to be formally made several months later concerning the normal contribution rate.[7]
Finally, as indicated above, at the time the amendment to the petition was served the board was still in a position to recompute the normal contribution rate. The certification of the contribution to be collected based on the contribution rate would not be made for five months. The collection itself would not take place until January and March of 1966. It seems, therefore, that the board could have complied with the demand with relative ease.
Because of all the above factors, the school districts did not unreasonably delay, as a matter of law, the making of the demand.
The determination of the courts below that the demand con *252 tained in the fifth cause of action was made unreasonably late is defective for another, independent, reason. Both courts assumed that the fifth cause of action should be treated, for laches purposes, as though it were first asserted at the time of the amendment, January 29, 1965. Under the provisions of CPLB 203 (subd. [e]), however, the courts were required to treat the fifth cause of action as though it had been asserted at the time of the filing of the original petition, July 20,1964.
The board had notice of the contentions later forthcoming in the amended petition when the original petition was served. Affidavits submitted in support of the original petition challenged the board’s departure from the regular interest assumption and reference to death-gamble liabilities in the calculation of the deficiency rate. And the petition itself asked that the ‘ ‘ Board be directed to * * * amend or modify any other [apart from the deficiency and special deficiency1] rates of contribution which the Court feels may be just and proper. ’ ’ These allegations were sufficient to put respondents on notice that the propriety of departing from regular interest assumptions and using prospective death-gamble liabilities would be challenged as to any computation which the board might make. These contentions form the gravamen of the fifth cause of action, which attacked the normal contribution rate for 1964-1965.
Thus regarded, the demand was made little more than four months after the normal contribution rate was disclosed (March 19,1964). In light of the complexity of the questions involved and the nonfinal nature of the March 19,1964 action, this delay could not be regarded as unreasonable. Consequently, the fifth catise of action is not barred by laches.
In sum: the first cause of action, seeking a refund of over-collection of the deficiency contribution in 1962-1963, in which year the not yet liquidated deficiency would be liquidated, was properly dismissed on the merits; the second cause of action, seeking a refund for the deficiency contribution in the ensuing year should be sustained on the merits and is not barred by the statutory limitation or laches; the third and fourth causes of action, relating to the liquidation period (17 and 30 years) of the special deficiency contribution, were properly dismissed on the merits; and the fifth cause of action, covering the improper factors introduced into the rate of normal contribution (interest *253 deficit, mortality table setback, and assumed extension of the death-gamble benefits) should be sustained on the merits, and is not barred by the statutory limitations or laches.
Accordingly, the order of the Appellate Division should be modified to the extent of reinstating the second and fifth causes of action and the matter remitted to Special Term for further proceedings, and the order should be otherwise affirmed.
Judges Scileppi, Bebgan and Keating concur with Chief Judge Fuld; Judge Bbeitel dissents and votes to modify in a separate opinion in which Judges Bubke and Jasen concur.
Order affirmed.

. “ the uniform and constant percentage of the earnable compensation of the average new entrant, who is a contributor, which if contributed on the basis of the compensation of such contributor throughout his entire period of active service, would be sufficient to provide for the payment of a death benefit payable on his account and to provide at the time of his retirement the total amount of his pension reserve.”

. “ the rate per centum of the total compensation of all contributors during the preceding school year which is equivalent to four per centum of the amount of the total pension liability on account of all contributors and beneficiaries not dischargeable by the aforesaid normal contribution made on account of such contributors during the remainder of their active service.”

. “the rate per centum of the earnable salary of all contributors obtained by deducting from the total liabilities of the pension fund the amount of the funds in hand to the credit of that fund and dividing the remainder by one per centum of the present value of the prospective future salaries of all contributors ”.

. “ the special deficiency contribution rate for use in determining the annual payments to be made in each fiscal year commencing with the year beginning with the first day of July, nineteen hundred sixty, shall be increased to liquidate the total unfunded special deficiency adjusted to include the prospective deficit in the annuity reserve fund”.
These additional liabilities could of course have been funded through the normal or deficiency contributions, but such funding would have been more burdensome and thus the Legislature provided for the funding on a more deferred basis.

. After the 1963-1964 fiscal year, the board no longer attempted to fund these deficiencies out of the historic deficiency contribution, but from the normal contribution, which gives rise to some of the claims in the fifth cause of action in this proceeding.

. This method of computation is in sharp contrast to the provisions governing the normal and deficiency contribution rates. There is no specific time base set for the computation of the normal and deficiency contribution rates and, in fact, the statute clearly intends that the valuations, and, therefore, the rates based on these valuations, change (§ 508, subd. 5).

. In fact, in their original petition, the school districts sought the reeomputation of "any other rates of contribution which the Court feels may be just and proper.”